Hey, good morning. This is the case of Mark Wagner v. Bella Lynn Gordon, individually in the Law Offices of Bella Lynn Gordon, 19-1-886. So you understand, this is the 1st District, 2nd Division. The three justices hearing the case are Justice Terry Lavin, Mary Ellen Coghlan, and James Fitzgerald Smith, myself. The procedure to be followed is the appellant will present their case for 5-15 minutes and there will be no interruptions. In other words, you get to present your whole case. After that, the justices will ask their questions. And following that, the appellee will have their opportunity to present their case. And then the justices again will present theirs. And following that, the appellant will have their closing arguments. With that, you may both start. Good morning, Justices. Thomas Gooch, GOOCH, appearing on behalf of the plaintiff appellant. With me is Sabina Wasik, to my left, who wrote the brief. And Amber Rodriguez, who is a law clerk and a third-year law student who assisted in the preparation of the brief. I'm not sure you can see her or not, but she's back in the corner. She's visible. We come before you on the granting of the motion for summary judgment against our client, Mark Wagner. And I would say at the very beginning that there is no case that I've ever seen that has more contested material facts than this one. The situation involves attorney Belle Lynn Gordon and her representation during a very narrow period of time from July until October of 2015. Ms. Gordon was employed to handle a custody dispute that was ongoing between Mr. Wagner and his former spouse and to effect a change in custody. There's also no question, as I'm sure you realize in reading the briefs, that young Wagner had a mind of his own. However, we maintain that that was exasperated by the advice given directly to him by the defendant, as well as the advice given to her client, Mark Wagner. The key allegations of the complaint are found in paragraphs 10, 11, 12, 13, 14, 15, and 18, which sets forth approximate costs. The trial court determined that there was no negligence by Ms. Gordon and there was, in fact, no wrongful conduct and that the costs suffered by Mr. Wagner had nothing to do with Ms. Gordon. Unfortunately, we believe, and I think the case law supports the cases that we've cited, and even in cases used by the trial court, the fact that approximate costs is a factual question if there are material disputes. And certainly, when you take the allegations of the complaint and you're like most favorable to Mr. Wagner, there are very serious disputes as to material facts in this matter. We maintain that when the young man was out in Frankfurt, time to come home, he announced he wasn't going to go home, that he wanted to stay with his father, he wanted to go to school out in Frankfurt, Illinois. The record, I think, is clear that Mr. Wagner immediately called Ms. Gordon, who said to keep him. That was the beginning of the malpractice. It was bad advice, and of course, the child heard the advice, which just emboldened him all the more. As things escalated, and emergency petitions were filed, Mr. Wagner, in relation to the complaint, brought the young man to Ms. Gordon's office, where he was instructed to hide the youngster up in the law library, not to bring him into the courtroom, and not to tell anyone that Ms. Gordon had interviewed him. All these things were done in front of the child, who was further emboldened by Ms. Gordon's behavior, who assured everyone that a change in custody would occur. The end result of all this is, and I question whether or not the divorce court really had the right to do it, but the child was sent to a boarding school in Wisconsin, the tune of, I believe, about $60,000 a year, and Mr. Wagner, as a punitive measure, was ordered to pay all of it. That's the damages suffered by Mr. Wagner in the malpractice case. We maintain that there is no question that the actions of Ms. Gordon constituted a breach of the standard of care, that too being a factual question. And we maintain that her wrongful advice to Mr. Wagner was a practical cause of just some enormous damages that he was made to suffer, all of which are set forth in our complaint. The defendant disputes almost all of these facts, and to me there's a clear area of disputed material facts that I've just been talking about, and I think they preclude summary judgment. Now, as we were writing the response, we came to the conclusion that we could also support our response with an affidavit from an expert, and you have to realize that at the time that we were writing this response, we had not reached a level of 213-3 disclosures. We were, at the time, just finishing up pursuant to a case management order, the 213-2 disclosure, so nothing came along that required us to get an expert at that point, and we thought that, well, perhaps we should get one anyway, as we discovered that an opinion on a practical cause might help, but it's certainly not required. The pleading is to find an approximate cause, and there is no real contest that the pleading set forth a cause of action. The dispute, again, is the facts of what went on and what impact it had on the court's decision to take the child and banish him to a school in Wisconsin and require Mr. Wagner to pay all of it. We maintain that it was caused by the actions or misactions of Bell and Gordon, and we should have the right to proceed to the trier of fact and attempt to secure a verdict based on that approximate cause. We can't, we can't, but what has happened is we've been deprived of the opportunity to do that by the actions of the trial court, which determined evidently as a matter of law that there are no contested facts, and the end result would have been the same. That, too, is a factual determination. We maintain that the record shows the results of the trial would not have been the same, and we believe we can prove that to be more likely truths than not by preponderance of the evidence. The child was emboldened by the actions of Bell and Gordon, and the trial court was certainly inflamed by the advice given per client by Bell and Gordon. There is no reason why we should not be able to proceed to a jury, particularly when you construe the law of summary judgment to construe things most favorably in favor of the defender and against the movement. So I think when you take the material facts that are set forth in Mr. Wagner's affidavit that's attached to our brief, and I strike that to the response to summary judgment, and realize that there was no affidavit by the movement, that deposition testimony, which they controlled, was relied on, and you take all of the excerpts from the depositions that we've cited, and I'm not going to read them for you because I know you have. There's a clear dispute as to ultimate material issues of fact, and we should be allowed to proceed to trial. That's basically what I have to say. Questions? Yeah, I'll start out. So it seems to me that what you're trying to allege here in terms of the negligence aspect of the prima facie case of attorney malpractice is that the attorney's advice exacerbated or emboldened the behavior of the minor child who refused to cooperate. Is that a fair summary of what you're saying? We're saying, Your Honor, we're saying that the advice given to her, given to Mr. Wagner by Belle Lynn Gordon to A, keep the child in Frankfort, Illinois, to B, not to allow him to return to his mother's house, C, to keep him hidden in the law library when a hearing was started, and D, interviewing him and then instructing her client not to tell anyone that interview took place, and all these conversations taking place in front of the child were negligent acts and a breach of the standard of care and resulted in what ultimately was a very costly endeavor by the Wagner family, all of which Mr. Wagner had to pay for. And we believe that at a point in the future, we'll be able to support those allegations of a breach of the standard of care by expert testimony. Having already written the order on original appeal on the appeal that from the trial court, I got to tell you, that's pretty skinny. Okay, that's not a heck of a lot. That's not a heck of a lot of proof of negligence, but let's accept that, that that's enough for negligence. The issue that I have with your current appeal is that I'm not seeing where you can show that but for Belle Lynn Gordon's actions, plaintiff would have been successful in the post-decree custody proceedings. I think that's the causation thing that you have real issues with. Mr. Wagner testified in his deposition and his affidavit that he relied on her advice, that had she not given that advice, he would have made the child, and we're dealing with, I'm a 15 year old, he's either 14 or 15. I raised three sons, I generally didn't have to tell them more than once what to do. And he would have been no different. He would have made the child go back to his mother's house. He testified, and I'm quoting here, it wasn't my decision, it was his decision, meaning the son. He said, I couldn't put him in his mom's car, he wasn't going to go. I mean, how do you nail the lawyer with that kind of conduct? Because Mr. Wagner believed that that was the child's decision after the child heard Belle Lynn Gordon tell him that there was going to be a change, not maybe, not perhaps, she was going to change the custody, that he did not have to go with his mother, that he could stay right where he was. Those are the things, and they're factual. Maybe a jury won't buy it, but a jury should have the right to try to hear it. Proximate cause can be a question for the court, especially in legal malpractice cases, and it just doesn't seem to me that you have anything that even comes close to approaching proof that, but for the actions of Belle Lynn Gordon, given all of these circumstances, and I'm quite familiar with all of them, I've read all this stuff, I don't think you have proximate cause in this malpractice case in any way, shape, or form. I'm sorry to hear you say that, Your Honor, I believe that our expert will give the necessary opinions to provide a direct verdict and proceed to a jury determination, and I think you should get that opportunity. That's all I have. Any other questions? I have a question. With respect to the expert, there was never any person identified, any affidavit, anything of substance tendered to the court, nor was there ever any motion asking for a continuance indicated to the court that you needed to do additional discovery to respond to the motion for summary judgment. Was there? In our response brief, we asked for the time to secure an expert. Right, I know that, but prior to that, you didn't do anything, right? No, because there had not been a 218 order entered yet requiring disclosure of expert witnesses. When the motion for summary judgment came along, the timeframe then was not sufficient to do it, and frankly, we had almost concluded the brief when we thought that not that an expert's affidavit would be required, but it would be helpful. But you did have a period of time within which to respond. You could have filed a motion requesting any number of things, but you didn't do it, right? I did not do it. No, ma'am. My other problem with this is, if I'm understanding your arguments correctly, a lawyer allegedly tells the client on a weekend in 2015, August of 2015, to keep the child, don't give the child back, or words to that effect. A significant period of time later, the child is ordered to go to boarding school because he hasn't gone to high school in over a year. Is that correct? That's exactly correct, Your Honor. And you attribute all of that to the lawyer's advice, keep this child this weekend, don't send him home to mom? The child believed, we believe the evidence would show, that based on what he heard Ms. Gordon say, he did not have to go to school, and evidence that custody would be changed. Well, even if that's true, how does that, of what significance is that? Because I think the advice by Ms. Gordon to both Mr. Wagner and his son was negligence, and I believe that's a factual question. That's what we're here to determine today, whether or not there are material issues of fact that prevent some rejuvenation from being entered, not whether or not a jury is going to agree with me. But I think we have enough to pass by the, excuse me, to pass by the direct and verdict stage. You do agree, however, that the actual conduct of this lawyer ended on that weekend of August 2015? No, I believe it went on at the first court hearing, when she told Mark Wagner to take the child, hide him in a wall library, don't let anyone know that he's here, because that action then caused the court to appoint a guardian and invite him. Right, but that was that, that was closely, that was that same August of 2015 timeframe, wasn't it? Yeah, it was, the emergency petition was filed, I believe the hearing took place in September. And then shortly after that, she withdrew? Yes. Anything further? No questions, nothing further. Amanda, you may proceed. Thank you, Your Honor. Thank you very much, Your Honors, and good morning, and good morning, counsel, and may it please the court. As Your Honors, I think you're pretty well aware, this case is really about an individual who's really just seeking to shift the blame or responsibility for his own actions to those of an attorney who represented him for approximately four months back in 2015. That same man has demonstrated, and I think it's pretty clear also in the other opinion as well, that he's willing to disregard expert opinions, recommendations about what's best for his son, and in fact, several, several court orders, but then not wanting to accept responsibility or consequences for those actions. So the trial court in this case was very, was very, very thorough in understanding the importance of the timeline. And I appreciate that Your Honors have taken the time to go through the briefs as well, and as well as Justice Lavigny, your other opinion, because the timeline is critical in this situation. The trial court in this case absolutely was correct in finding that there was no question of material fact as to the issue of proximate cause. The plaintiff in this case admitted that he didn't actually rely on or act upon Val Gordon's alleged advice to keep the child home. He testified in his deposition that he did everything he could. He could not get the child to get into the car. The police were called. The sheriff could not get the child to go into the car. The plaintiff testified that he feared for his son's safety at that point, and that he did everything he could, but he was afraid that Matthew was going to jump out of the car. So any alleged advice that Ms. Gordon told him of, okay, if you're worried about his safety, then just keep him home. We'll have to file a motion with the court and figure this out. It sounds like, number one, he didn't actually act on that advice because he said that he tried everything he could do. And number two, the outcome would have been the same. So if he had not listened to Val Gordon and forced his son to get into the car, he testified that he believed his son would jump out or run out into the cornfields or run away or harm himself. So really, Val Gordon's advice during this August 17th emergency incident where Matthew had locked himself in his room and wouldn't come out really had nothing to do with the ultimate orders that the court enters over a year later. And I think that's really the crux of our main point in our brief. Because, again, if you look at the timeline of all these events, the situations with parenting Matthew, the problems began way back in 2013. Two different psychologists were expressing severe concerns using terms like pathological enmeshment, finding that the plaintiff in this case was unduly influencing his 12-year-old son, basically manipulating him to the point where he was, and this is a direct quote, it's in the record on C-207, that the plaintiff was facilitating rebellion in Matthew to rebel against his mother, to rebel against the court order saying that he had to live with his mother and attend school in Evanston, hoping that by virtue of his refusal to comply with the court's order, the court would relent and let him move to Franklin Grove and attend school there. That all happened way back in 2013. And I don't want to harp on the facts too much, Your Honors, because I know you're very familiar with it, especially with the other opinion, but I think it's, again, so important because that's exactly what Judge Akron looked at in this case. He realized that, wait a minute, way back in 2013, there was specific findings that the plaintiff was initiating this rebellion in his son in hopes that it would result in a custody change. This did not begin with or come from anything that Bell and Gordon did or didn't say. There's emails throughout the record where the plaintiff's claiming that he's fearful of his son's safety and therefore he wants to change the parenting agreement that he entered into only four months earlier. All of this predated Bell and Gordon's involvement. She only gets involved after the plaintiff's ex-wife filed an emergency motion to suspend parenting time because it was claimed that the plaintiff was encouraging Matthew to skip school. So that's the point when Bell and Gordon gets involved. The plaintiff retains her and says, oh, I think Matthew's going to harm himself if I make him get into the car. That's what then generates these emergency motions. So on August 18th, that's when Nancy is the plaintiff's ex-wife's name. Nancy files this emergency petition and says on four prior occasions, way before August 17th, that Matthew was refusing to attend school based on plaintiff's support, encouragement, and recommendation. And that's in the record beginning in C-378, where you can read through that petition and see what really Bell and Gordon was presented with on August 17th. Following the court's August 19th, 2015 order requiring Matthew to go back, Bell and Gordon writes the plaintiff an email, kind of interestingly worded, but essentially tells him that if he does not start complying with the court orders, he's going to go to jail in Cook County. She's very, very emphatic about the importance of Mark Wagner, the plaintiff in this case, listening to the court's orders. And that's on C-394. Mark does not comply, the plaintiff does not comply. Matthew stays and fails to return. That generates the next emergency motion from Nancy. At that point, that's when guardian ad litem Howard Rosenberg is appointed. And his testimony in this case is also really critical. And Judge Akron did a great job of understanding the full circumstances because it wasn't just Matthew hidden away in some law library. It was also Matthew being spoken to directly by Judge Drew and being spoken to directly by Howard Rosenberg and being told in no uncertain terms that if he does not follow the court's orders, he will be sent to boarding school. Howard Rosenberg then finds that as soon as they finish that meeting out in the hallway, the plaintiff says to Matthew something of the effect of, well, there's stuff that's written on paper and what people tell you you're supposed to do. But then, you know, really, you have to do what's really best for you. He's telling this to a 13-year-old boy, essentially saying, you don't have to listen. Howard Rosenberg reports this back to Judge Drew and says, I just, I talked to him. And then he's in the hallway and Mark Wagner is telling him, you don't have to listen. At that point, that's when the court tells the plaintiff himself that he's undermining the court's authority and tells Matthew himself, you must attend school. We will be looking at boarding school and I'm going to force your dad to pay the cost. If you don't start listening and attending school. They then have two more status hearings. Finally, September 2nd, my client, Ms. Lynn Gordon, sends an email to the plaintiff and reiterates there will be serious repercussions if Matthew does not attend school. If you do not convince him or work with him or you both don't comply with these court orders, there will be serious repercussions and it's going to be boarding school and it's going to be you having to pay for it. And again, that's documented in the record that C-471 through 472, those emails that she's sending saying you must comply with the court's order. September 8th is the other hearing where Judge Trudeau does a really good job. And that's her past his prologue order. Where she goes through everything and finds that the plaintiff's repeated disregard of the court's authority, his repeated disregard of what experts are telling him is best for his son and for his son's development. He doesn't care. He's disregarding all of it. At that point, the judge orders boarding school for Matthew. And at that point, my client in October of 2015 withdraws from representing. I'm sorry, I misspoke there. The September 8th is the order where she says if he doesn't attend school in Evanston, she will order boarding school. That's very clear. October of 2015, my client withdraws from representing the plaintiff. Fast forward an entire year. Matthew has now skipped an entire year of school at Evanston. And they are now back with another hearing. The plaintiff now has a new attorney. And suddenly, the plaintiff has changed his mind and he thinks Evanston is a much better idea than boarding school. The court is not impressed. And the court does not believe in his sincerity and issues in order of finding that boarding school is in Matthew's best interest. At this point, Matthew's had some other psychological issues. He's had to have some impatient time to really work on a lot of things. And especially the issues that his parents were having. As you know, Justice Levin, that order was appealed and it was affirmed by this court. And this court further found that there was absolutely no abuse of discretion in requiring the plaintiff to pay 100% of it based on his behavior throughout this whole time period. And I believe, again, this court, just like the trial court and just like all the experts in this case, found that the plaintiff had this systematic campaign and insidious means of manipulation for this 13, 14-year-old boy. And that Matthew was in a crisis and that boarding school would be best for him. Now, the one really happy fact that we found throughout all of this is, throughout our depositions in this case, I was thrilled to find that Matthew is thriving. The plaintiff testified that he did amazing in boarding school, that he's happy, he's well-adjusted. And I'm sorry, Judge, I think I'm out of time. I'm looking at my timer. I think I'm... Finish up quickly. Okay, thank you. I think that when you look at the whole time frame, the whole timeline, the whole story, it demonstrates that nothing that Bell and Gordon did or failed to do approximately resulted in the plaintiff having the paper he was sent to go to boarding school. And as to the argument about not getting an expert affidavit, there is nothing precluding the plaintiff from getting an expert. They could have filed an expert affidavit at any time. They could have filed a motion to stay. And they certainly didn't file a 191B affidavit. So that was certainly not an abuse of discretion on the part of Judge Agran and not allowing them additional further time to do that. And I thank you very much for your patience, and I'd be happy to take any questions. Questions? None for me. None for me either. None for me. So, Appellant, you may do your closing. We've been arguing about the facts. We're still arguing about the facts. It may very well be that everybody is right and I'm wrong, and a jury will say, and gee, as to Miss Gordon. But it's not an appropriate matter for summary judgment at this stage in the proceedings. I would agree with you if you had submitted a 191B affidavit. Look, I handled malpractice cases for almost 30 years, Counsel, okay? This is as close to frivolous litigation as I've seen. Well, I'm sorry to hear you say that, Your Honor. After, I don't know, I've probably done a couple hundred legal malpractice cases. And it seemed to me to be a pretty good one. And I don't, frankly, I'm not going to agree that I've ever filed a frivolous lawsuit. Are we done? There's a lot to go on yet in this case. If I thought it was in the slightest frivolous, I never would have filed it. All right, well, I don't think we need to go into that. That's kind of an extemporaneous personal feeling there. Anything else? No, ma'am. I think, again, it was not time for expert testimony. The time for summary judgment was after expert disclosures and opinions were made and examined. At this stage of the proceeding, it was not the proper time to make factual determinations with or without expert affidavits and enter summary judgment. And, Your Honor, I apologize if I was a little aggressive when I said I didn't do anything frivolously. No, look, I was probably being a little bit aggressive and you responded in kind. You're not going to hurt my feelings and I'm not trying to hurt yours. You haven't. All right. Any questions? No, nothing. All right. Thank you very much. You both made very entertaining arguments. The briefs, the young ladies that wrote these briefs did a very nice job. I was very impressed. And you keep doing that. And with that in mind, we're done. We'll let you know as soon as we've discussed the case. We'll put it out for you. Thank you.